UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:12-CV-00195-TBR

MISTY TURNER                                                                                    Plaintiff

v.

BRIAN D. HILL                                                                                   Defendant

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court upon Defendant Brian D. Hill's Motion for Summary Judgment. (Docket No. 17.) Plaintiff Misty Turner has responded, (Docket No. 19), and Defendant has replied, (Docket No. 33). For the reasons that follow, Defendant's Motion will be GRANTED IN PART and DENIED IN PART.

BACKGROUND

This action arises out of the warrantless arrest of Plaintiff Misty Turner by Defendant Brian Hill, a trooper with the Kentucky State Police (KSP), on September 21, 2012. The undisputed facts are as follows. Plaintiff had given permission for her ex-boyfriend, Murray Akers, to remove certain lawnmowers and appliances from her property. When Plaintiff returned home the afternoon of September 21, she learned that Akers also had taken some scrap copper from an adjacent trailer without Plaintiff's permission. Plaintiff and two other individuals, Elizabeth Moore and Ronald Hoyley, then drove to Akers' residence to address his taking of the copper. Once at Akers' home, Plaintiff advised Akers she was taking the copper back, and a disagreement ensued. Akers, apparently upset and in an attempt to prevent Plaintiff from retaking the

copper, began firing a handgun into the air and ground. Plaintiff advised Akers she was going to call 911 and did so, and at some point Akers struck Plaintiff in the face and jaw with his elbow. Plaintiff instructed Moore to get back in Plaintiff's vehicle, and Moore and Hoyley drove away. Plaintiff, still at Akers', attempted further discussions with Akers for a time but was unsuccessful in resolving the dispute. When Akers again pulled out his handgun, Plaintiff executed her own escape by driving off in Akers' pickup truck. Plaintiff drove Akers' truck approximately a half mile away from Akers' residence where she met up with Moore, who was still driving Plaintiff's vehicle. Plaintiff left Akers' truck parked there on the side of the road and, after transferring some of the stolen copper from Akers' truck into her own vehicle, returned home, dropping off Moore along the way. Plaintiff later telephoned Akers to tell him where his truck was parked, afraid that he might come looking for her and/or his truck. Akers, thinking Plaintiff had stolen his truck, called 911 to report the theft.

The 911 calls were routed to KSP Post #1 in Mayfield, Kentucky, which assigned the investigation to Defendant. Defendant proceeded to Akers' residence to investigate and, while en route, spotted Akers' truck parked on the side of the road. Defendant then continued to Akers' home where he spoke with Akers and Akers' girlfriend. Defendant ascertained from Akers that there had been a dispute over some scrap copper. Akers initially stated that he did not want to press charges against Plaintiff, and Defendant left; however, Akers subsequently telephoned dispatch and advised that he had changed his mind and did want to press charges, so Defendant returned to speak with Akers again. Akers provided Defendant with Plaintiff's cell phone number, and Defendant called Plaintiff to ask if he could come by her residence

and speak to her. Plaintiff assented and provided her address, telling him she would be waiting in the driveway. When Defendant arrived, he questioned Plaintiff about the copper, and Plaintiff showed him the copper that had been transferred to her vehicle from Akers' truck. Defendant, aware that there had been a series of recent copper thefts at a nearby train yard, asked if he could look around Plaintiff's property. Plaintiff agreed and showed him the adjacent trailer from which the copper had been taken. Plaintiff also allowed Defendant to look into a garage or shed on her property.

Defendant then asked if he could look inside the home, and Plaintiff allowed him in.[1] The parties' accounts diverge significantly as to the events thereafter. For purposes of this Opinion, the Court will presume Plaintiff's version of the facts to be true. Once inside the home, Defendant detected a strong odor of marijuana. Plaintiff testified that Defendant began looking through her trash can for evidence of marijuana, telling her she was "going to jail for a [marijuana] stem" he had found in the trash. (Docket No. 20-1, at 20.) Plaintiff then began to place a phone call to her mother to ask her mother to come to her home and to contact an attorney. Fearing that Defendant was going to take her phone away, Plaintiff went to the bathroom to make the call. Plaintiff testified that Defendant "watched [her] walk away" and "didn't try to stop [her]." (Docket No. 20-1, at 20.) She maintains that Defendant did not instruct her not to leave

---

[1] According to Defendant, he asked if they could go inside, and Plaintiff opened the door. (Docket No. 20-2, at 10.) Plaintiff initially testified she did not allow Defendant to enter the home, stating, "[H]e just opened the knob and went in." (Docket No. 20-1, at 20.) However, this statement is inconsistent with her Complaint, which states, "Trooper Hill then requested to come inside Ms. Turner's home to look for more copper, and she allowed him to come inside her home." (Docket No. 1, at 2.) When this discrepancy was pointed out during Plaintiff's deposition, she ultimately conceded that she had allowed Defendant into her home. (Docket No. 20-1, at 28-29.) Regardless of any factual disagreement in this regard, Defendant's entry into the home does not appear to be an issue that needs be addressed here.

the room.  (Docket No. 20-1, at 21.)  Plaintiff states that Defendant then entered the bathroom through an alternate door and grabbed her arm.  In the process, she says Defendant tripped over a table in the adjacent bedroom and fell onto a bed on the floor of that room.  Plaintiff maintains that she did not grab Defendant, but rather Defendant "swatted" her with his flashlight, hitting her in the right wrist.  (Docket No. 20-1, at 23.)

Plaintiff testified that Defendant then handcuffed her after she came out of the bathroom.  (Docket No. 20-1, at 21, 24.)  She acknowledged that Defendant told her to put her hands behind her back and testified that she complied with those instructions.  (Docket No. 20-1, at 23.)  When asked whether she "ever wrestle[d] with [Defendant] while he was trying to get [her] to comply," Plaintiff responded, "No."  (Docket No. 20-1, at 23.)  She also testified that Defendant did not have to struggle with her in order to handcuff her.  (Docket No. 20-1, at 24.)

After being handcuffed, Plaintiff says she "turn[ed] to walk out the door to wait for [Defendant] outside," asking him, "I'm going to jail . . . can I just go outside and smoke a cigarette?"  (Docket No. 20-1, at 21.)  As she turned to walk away, still handcuffed, Defendant told her he was going to tase her.  According to Plaintiff, Defendant fired his Taser at the same time or immediately after he gave her that warning.  (Docket No. 20-1, at 21 ("I guess when he said taser shoot, he had already shot it. . . . I think at the time he was saying it, he was shooting me.").)

Plaintiff insists she was hit with a total of three probes from Defendant's Taser: two in her back and one in her ear.  (Docket No. 20-1, at 22.)  Plaintiff testified that Defendant thereafter pulled out the probe that had hit her in the ear, telling her that "if

he didn't remove it, [she would] get lead poison[ing]." (Docket No. 20-1, at 28.) When asked about the probe that hit her ear, Plaintiff testified:

> Q. . . . But Trooper Hill removed the one from your ear?
> A. Yeah, he jerked twice to get -- real hard.
> Q. Okay.
> A. He wanted to pull these out.
> Q. Okay. And did you say no?
> A. Correct.

(Docket No. 20-1, at 30.) The other two probes that hit Plaintiff in the back were removed later by emergency medical personnel. (Docket No. 20-1, at 30.) Although she was wearing earrings and had multiple piercings in her ear, Plaintiff denies that the injury to her ear was caused by an earring becoming snagged in the carpet or hitting a dresser as she fell. (Docket No. 20-1, at 26.)

At the time of the events in question, Defendant carried a Taser model X-26 electronic control device (ECD), which is the standard Taser issued to KSP troopers. The KSP policy on ECDs is set out in General Order AM-G-5b. (*See* Docket No. 17-3.) The basic operation and function of the Taser X-26 do not appear to be disputed. The Taser uses removable cartridges, each of which contains two probes.[2] When the trigger is pulled, the cartridge opens and the two probes are propelled by nitrogen toward the target. After deployment, the probes remain connected to the device by two thin wires that carry the electric charge from the ECD to the target. Each probe has a small barb on the end, which helps the probe attach and remain in contact with the target. As long as the probes remain in contact with the target, the trigger may be pulled again, each

---

[2] The parties refer to these probes at various times as "barbs," "darts," "needles," or "hooks."

time delivering a new "cycle" of electric current for a specified duration of time. When the Taser is deployed, an internal memory device documents the sequence and records such information as the model and individual serial numbers, the exact time the Taser was fired, and the duration of the electrical discharge. This data then can be downloaded from the device to produce a report showing each time a particular Taser is fired, the precise time it was fired, and the duration of the electrical charge transmitted for each firing.[3]

Defendant has produced a copy of report created by downloading the data from his Taser. (*See* Docket No. 17-5.) That report shows that Defendant's Taser was fired twice on September 21, first at 9:03:06 p.m., local time, and again at 9:03:19, each time delivering a five-second-long cycle of electric current. (Docket No. 17-5, at 1.) As noted in the footnote below, the report does not show whether both five-second cycles were delivered by one cartridge or whether two cartridges were fired. *See supra* note 3.

Plaintiff eventually was charged with four crimes: (1) theft by unlawful taking, a class D felony; (2) possession of marijuana, a class B misdemeanor; (3) receiving stolen property under $500, a class A misdemeanor; and (4) resisting arrest, a class A misdemeanor. The resisting arrest charge was dropped, and the felony theft count was amended down to unauthorized use of a motor vehicle, a class A misdemeanor. Plaintiff thereafter pleaded guilty to possession of marijuana, theft by unlawful taking, and receiving stolen property.

---

[3] As best the Court can tell, although this report records each firing, it does not distinguish between the firing of different cartridges—that is, the firing of two separate cartridges would appear on the report much the same as would the firing of one cartridge followed by the firing of a subsequent cycle of electric current delivered through that same cartridge.

## STANDARD

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; he must present evidence on which the trier of fact could reasonably find for him. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). "[T]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Still, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1).

DISCUSSION

In her Complaint, Plaintiff alleges four counts: (1) excessive force in violation of the Fourth Amendment, brought under 28 U.S.C. § 1983; (2) battery, under Kentucky law; (3) negligence, under Kentucky law; and (4) negligence *per se*/unnecessary force in violation of Ky. Rev. Stat. § 431.025. Defendant presently moves for summary judgment on each of these four claims.

I. **Excessive Force Claim under 28 U.S.C. § 1983**

In order to prevail on her § 1983 claim for excessive force, Plaintiff must establish that a constitutional violation occurred and that Defendant is not entitled to qualified immunity. *Slusher v. Carson*, 540 F.3d 449, 453 (6th Cir. 2008). Because Defendant asserts he is entitled to qualified immunity, the Court will first determine whether Defendant's actions were unconstitutional before turning to whether Defendant is entitled to qualified immunity for any such violation.

A. **Constitutional Violation**

There is no dispute whether Plaintiff was "seized" for purposes of triggering the Fourth Amendment's protections. Accordingly, the Court will proceed to determine whether the force used was unreasonable under the Fourth Amendment. In making this determination, courts employ an "objective reasonableness" standard. *Id.* at 455. "Relevant factors to consider in evaluating what level of force is reasonable include the 'severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (alteration in original) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Still, the Sixth Circuit advises that "[t]hese factors

are not an exhaustive list, and the ultimate inquiry is whether the seizure was reasonable under the 'totality of the circumstances.'" *Id.* (quoting *Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2006)). Additionally, the "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene rather than with the benefit of hindsight. *Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 95 (6th Cir. 2012) (citing *Graham*, 490 U.S. at 396). This means that courts must take into account "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (quoting *Graham*, 490 U.S. at 397). "Ultimately, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* (internal quotation marks omitted) (quoting *Graham*, 490 U.S. at 397).

### 1. Severity of the crimes

Defendant argues that "[t]his case involves serious criminal activity," reasoning that "[t]he facts giving rise to this arrest involves [sic] a convicted felon, illegal drugs, gunplay, ex-lovers, multiple physical assaults, and other serious criminal activity." (Docket No. 17-1, at 12.) Defendant specifically points out the events at Akers' residence and places much emphasis on Akers' firing a handgun and the fact that Akers was "a convicted felon and known Meth addict." (Docket No. 17-1, at 13.) But contrary to Defendant's position, Akers' actions and the events at Akers' residence have little, if any, relevance to the Court's consideration of this first factor. Defendant's

involvement began when he responded to the 911 call in which Akers reported that Plaintiff had driven off in his truck. Defendant located Akers' truck prior to arriving at Akers' home and speaking to Akers. Defendant testified in his deposition that upon recovering the truck and speaking to Akers, his investigation was essentially complete: "[Akers] advised that he didn't want to press charges, he didn't want anybody to go to jail. So at that point, I've recovered the truck, I've got his property back, my victim is satisfied; I would typically leave the scene, and I did." (Docket No. 20-2, at 8.) Defendant's investigation only resumed after Akers had a change of heart and called back to say he wanted to press charges after all, at which point Defendant told Akers: "I'm going to talk to her. We'll figure this out and we'll see where it goes." (Docket No. 20-2, at 8.) Yet even after arriving at Plaintiff's residence and speaking with her about the day's events, Defendant still had not decided whether to arrest her in relation to her driving off in Akers' truck:

> Q.  Okay. Well, at that point, had you decided to arrest [Plaintiff] for the truck incident, as I'll call it?
>
> A.  At this point, I'm still gathering information. You know, I don't want to arrest her right then without getting all of the facts. You know, I want to speak with her and figure out what actually happened at [Akers' residence].

(Docket No. 20-2, at 9.) Thus, the evidence of record—namely, Defendant's own testimony—suggests that he did not perceive any potential crime relative to Akers' truck as particularly severe. This inference is buttressed by the fact that Plaintiff was not arrested for, or charged with, any crime relative to her driving off in Akers' truck.

Ultimately, the Court concludes that none of the crimes at issue were particularly serious or severe. The charges of marijuana possession and receiving stolen property

were misdemeanors, and the theft charge, which was subsequently amended down to a misdemeanor, was at best a nonviolent felony of the lowest class under Kentucky law. *See* Ky. Rev. Stat. § 532.020(1). Akers' alleged actions do not appear to have resulted in any criminal charges and are not the proper focus of "the crimes at issue." But regardless of the severity of Akers' actions, those actions were remote in time to Plaintiff's arrest and thus have no bearing on whether Defendant used excessive force in effecting that arrest. Accordingly, the Court concludes that the severity of the crimes at issue should weigh against finding that Defendant's use of force was objectively reasonable.

        2.        **Immediate threat to the safety of the officer or others**

Defendant again places much emphasis on Akers' actions of firing a handgun and Akers' alleged use of methamphetamines to argue that the situation presented a serious risk both to Defendant's safety and to that of others. For the same reasons discussed above in relation to the severity-of-the-crime factor, this argument again is misplaced.

Defendant also argues that "[t]here was a real threat of accomplices," because he "was unsure whether [Taylor] and [Hoyley] were lurking somewhere in the darkness inside the residence." (Docket No. 17-1, at 14.) In this regard, Defendant testified: "There's several things in my mind . . . . We haven't talked about it, but I wasn't so sure [Plaintiff] was alone in that house. The information I had was there were multiple people involved earlier, and there still possibly could be one more person or several." (Docket No. 20-2, at 17.) But this argument is contradicted by Plaintiff's testimony, in

which she expressly stated that when asked, she had informed Defendant that neither Moore nor Hoyley was present. (Docket No. 20-1, at 26.)

Defendant further argues that an immediate threat existed because Plaintiff "got physical" with him, "assaulted him," and fled to the bathroom where she could have obtained a weapon. (Docket No. 17-1, at 14.) However, assuming Plaintiff's version of the facts as true, there was little, if any, altercation that took place, and Defendant did not have to struggle with her in order to handcuff her. (*See* Docket No. 20-1, at 23-24.) Furthermore, assuming Plaintiff was handcuffed at the time she was tased, the threat she posed to Defendant was minimal or at least seriously diminished, despite that it was dark inside her home.

Therefore, in view of the totality of the circumstances present inside Plaintiff's home, the Court concludes that Plaintiff posed little, if any, threat to Defendant or to others. As such, this factor also weighs against finding that Defendant's use of force was objectively reasonable.

### 3. Actively resisting arrest or attempting to evade arrest by flight

Defendant contends that "there can be little doubt that [Plaintiff] actively resisted arrest." (Docket No. 17-1, at 16.) Aside from referencing his own deposition testimony, Defendant bases his argument in this regard on the testimony of his expert, William Gaut, Ph.D., stating: "Dr. Gaut testifies that [Plaintiff] was combative, assaulted [Defendant], grabbed his arm, and refused his verbal commands." (Docket No. 17-1, at 16.) Defendant also argues that Plaintiff attempted twice attempted to flee from Defendant: first into the bathroom and second just before she was tased. Again, Defendant points the Court to Dr. Gaut's testimony that Plaintiff had "demonstrated the

propensity for flight." (Docket No. 17-1 (referencing Docket No. 20-3, at 21)).) But how Dr. Gaut—an expert on police practices retained for purposes of litigation—has any insight into the factual happenings inside Plaintiff's home escapes the Court. Again, taking Plaintiff's version of the facts as true, it would appear she did not actively resist arrest or attempt to flee. (*See* Docket No. 20-1, at 23-24.) Accordingly, this factor also weighs against finding that Defendant's use of force was objectively reasonable.

### 4. Further considerations

Beyond the three *Graham* factors discussed above, the totality of the circumstances compels the conclusion that, taking Plaintiff's version of the facts as true, Defendant's use of force was not objectively reasonable. Of principal importance is the fact that Plaintiff was handcuffed when Defendant first deployed his Taser. The Sixth Circuit has long held that the need for force is virtually "nonexistent" when a suspect is handcuffed and not actively trying to resist or escape. *See McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988). In a recent decision, *Austin v. Redford Township Police Department*, the Sixth Circuit recognized:

> [T]he law is clear in this Circuit that the use of force, including a Taser, on a suspect who has been subdued is unreasonable. . . . *See Grawey v. Drury*, 567 F.3d 302, 314 (6th Cir. 2009).
> 
> . . . .
> 
> Our "prior opinions clearly establish that it is unreasonable to use significant force on a restrained subject, even if some level of passive resistance is presented." *Meirthew v. Amore*, 418 F. App'x 494, 497 (6th Cir. 2011)). Further, "a line of Sixth Circuit cases holds that the use of non-lethal, temporarily incapacitating force on a handcuffed suspect who no longer poses a safety threat, flight risk, and/or is not resisting arrest constitutes excess force." *Michaels v. City of Vermillion*, 539 F. Supp. 2d 975, 985-86 (N.D. Ohio 2008) (citing cases)). "Absent some compelling justification—such as the potential escape of a dangerous criminal

> or the threat of immediate harm—the use of such a weapon on a non-resistant person is unreasonable." *Kijowski v. City of Niles*, 372 F. App'x 595, 600 (6th Cir. 2010) (discussing use of a Taser).

690 F.3d 490, 496-98 (6th Cir. 2012).

Here, under Plaintiff's version of the facts, she was not actively resisting arrest, was not attempting to flee, and posed no real threat to Defendant or herself. Even under Defendant's version of the facts, the potential for Plaintiff to actually escape was arguably minimal, as was the level of threat she posed. At the point that Defendant deployed his Taser, it was clear to Defendant that Plaintiff was not armed, and there was nothing to indicate that she then intended to arm herself. Accordingly, these considerations also weigh against finding that Defendant's use of force was objectively reasonable.

Of final note, Defendant raises a compelling argument as to the inherent plausibility of several of Plaintiff's factual assertions. By way of his Reply, Defendant posits that Plaintiff's testimony that she was tased while walking away, to go outside and smoke a cigarette, already handcuffed, "begs the question - how was she going to smoke a cigarette with both of her hands handcuffed behind her back?" (Docket No. 33, at 1.) Also, for the first time in his Reply, Defendant has produced an affidavit by Charles Fisher, the paramedic who initially treated Plaintiff and removed the taser probes from her back, which appears to refute Plaintiff's assertion that she was hit in the ear by a third Taser probe. (*See* Docket No. 33-1.) But despite the cogency of these arguments, the veracity of Plaintiff's testimony is a proper matter for cross-examination, the plausibility of her version of the facts is a matter properly decided by a jury. A factual dispute certainly remains whether Defendant fired one cartridge or two, and

whether one of the Taser probes hit Plaintiff's ear as she claims. Assuming Plaintiff was handcuffed when Defendant first deployed his Taser, the Court's analysis and conclusion here would be the same regardless of how many cartridges were fired or where or how many of the Taser probes hit her—if she was handcuffed and subdued as she claims, Defendant's use of force would not be objectively reasonable either scenario. *See, e.g.*, *Austin*, 690 F.3d at 496-98. Thus, in view of the facts testified to by Plaintiff, the Court is left with the conclusion that a genuine factual dispute exists as to whether the force used by Defendant was excessive.

For these reasons, the Court concludes that the reasonableness of force used by Defendant—*i.e.*, whether a constitutional violation occurred—presents a question of fact not suitable for resolution by summary judgment.

### B. Qualified Immunity

The Court next must determine whether Defendant nonetheless is entitled to qualified immunity. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Feathers v. Aey*, 319 F.3d 843, 847-48 (6th Cir. 2003) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The Supreme Court instructs lower courts to perform a two-tiered inquiry to determine whether a defendant is entitled to qualified immunity." *Austin*, 690 F.3d at 496 (citing *Saucier v. Katz,* 533 U.S. 194, 201 (2001)). First, a court must determine whether the facts alleged show that the defendant's conduct violated a constitutional right." *Id.* (citing *Saucier*, 533 U.S. at 201). "If the plaintiff establishes that a

constitutional violation occurred, a court must next consider 'whether the right was clearly established.'" *Id.* (quoting *Saucier*, 533 U.S. at 201). When a defendant raises the defense of qualified immunity, the plaintiff bears the burden of showing that he is not entitled to it. *Id.* (citing *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)).

As noted above, the facts viewed in the light most favorable to Plaintiff show that a constitutional violation occurred. Defendant argues that "[Plaintiff] does not have a clearly established constitutional right to be free from being tased by a law enforcement officer, especially where the proof indicates that she assaulted him, fled, and actively resisted arrest." (Docket No. 17-1, at 32.) Defendant may be correct in this assertion; however, the "proof" Defendant relies upon appears primarily to be his own testimony regarding what transpired inside Plaintiff's home. Contrary to Defendant's position, and again assuming Plaintiff's version of the facts to be true, Defendant's actions unquestionably show a violation of the clearly established right to be free from excessive force, which a reasonable officer would be aware of at the time of the events in question. *Austin*, 690 F.3d at 496 ("[T]he law is clear in this Circuit that the use of force, including a Taser, on a suspect who has been subdued is unreasonable and *a violation of a clearly established right*." (emphasis added)). Because Plaintiff has offered sufficient evidence to indicate that Defendant's actions were objectively unreasonable in light of that clearly established right, Defendant is not entitled to qualified immunity on Plaintiff's excessive force claim.

## II. Battery Claim Under Kentucky Law

Under Kentucky law, a battery is "any unlawful touching of the person of another, either by the aggressor himself, or by any substance set in motion by him." *Vitale v. Henchey*, 24 S.W.3d 651, 657 (Ky. 2000). A police officer is privileged to use the amount of force that he reasonably believes is necessary to overcome resistance to his lawful authority; however, when he deliberately exceeds the privileged amount of force he is liable for the tort of battery. *Ali v. City of Louisville*, 2006 WL 2663018, at *8 (W.D. Ky. Sept. 18, 2006) (citing *City of Lexington v. Gray*, 499 S.W.2d 72, 74 (Ky. 1973)). Defendant argues that summary judgment is warranted because he was acting in a lawful manner and used only reasonable and necessary force to effect Plaintiff's arrest. (Docket No. 17-1, at 26-27.) Having concluded above that a genuine factual dispute exists whether Defendant's actions constitute excessive force, the Court similarly concludes that a genuine dispute exists whether Defendant's actions constitute battery under Kentucky law. *Cf. Atwell v. Hart Cnty., Ky.*, 122 F. App'x 215, 219 (6th Cir. 2005) (finding that a plaintiff's battery claim under Kentucky law was defeated by a finding of objective reasonableness in regard to his § 1983 excessive force claim).

Still, Defendant insists that he is entitled to official immunity on Plaintiff's state law battery claim. In Kentucky, "'[o]fficial immunity' is immunity from tort liability afforded to public officers and employees for acts performed in the exercise of their discretionary functions." *Yanero v. Davis*, 65 S.W.3d 510, 521 (Ky. 2001). Qualified official immunity applies to the performance by a public officer of discretionary acts that are taken in good faith and within the scope of the officer's authority. *Id.* at 522. A lack of good faith "can be predicated on a violation of a constitutional, statutory, or

other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position." *Id.* at 523. Thus, in effect, this inquiry tracks the inquiry for objective reasonableness and qualified immunity discussed *supra* Part I. For the same reasons set forth above relative to her § 1983 excessive force claim, the Court finds that Plaintiff has sufficiently shown a violation of a clearly established right that an officer in Defendant's position presumptively would have known was afforded to her. Therefore, Defendant is not entitled to official immunity on Plaintiff's battery claim.

## III. Negligence/Negligence Per Se Claims Under Kentucky Law

Plaintiff asserts the additional state law claims of negligence and negligence *per se*, arguing that Defendant's use of his Taser while she was handcuffed as well as his removal of the Taser probe from her ear constitute violations of the statutory standard of care set forth in Ky. Rev. Stat. § 431.025(3), which commands that "[n]o unnecessary force or violence shall be used in making an arrest." Defendant argues that Plaintiff's negligence and negligence *per se* claims should be dismissed because she has no expert proof, urging: "Whether [Defendant] owes a duty to [Plaintiff], what duty is owed, and whether [Defendant] deviated from the applicable standard of care are issues that demand expert testimony to assist the jury. Furthermore, expert testimony is needed to establish causation." (Docket No. 17-1, at 30.) The Court disagrees and finds Defendant's argument on these claims misguided; however, the Court nonetheless concludes that Defendant's alleged actions in this case cannot properly be analyzed as negligence claims.

As this Court previously explained in *Ali v. City of Louisville*, the use of excessive force by a police officer constitutes the intentional tort of battery. 2006 WL 2663018, at *8. An officer is privileged to use the amount of force that he reasonably believes is necessary to overcome resistance to his lawful authority, but no more. 2006 WL 2663018, at *8 (W.D. Ky. Sept. 18, 2006) (citing *Gray*, 499 S.W.2d at 74 (applying Ky. Rev. Stat. § 431.025(3))). When he deliberately exceeds the privileged amount of force by committing an unwarranted violence on the arrestee, he is liable for the tort of battery, not for negligence. *Id.* (referencing *Gray*, 499 S.W.2d at 75). "There is no such thing as a negligent battery." *Id.* (citing Restatement (Second) of Torts § 13). That an officer may have mistakenly believed he needed to use the amount of force he did does not change the fact that his initial action was intentional, nor does it alter the objective analysis of whether the force he used was excessive. *Id.* "Thus, where an unwanted touching (a battery), which is inherent in any arrest, escalates beyond that which is reasonably necessary into excessive force, the cause of action is solely for battery, with the officer's privileged use of force ending when the excessive force began." *Id.* To permit a separate claim for negligence premised on the same conduct by the officer is logically and doctrinally unsupportable. *Id.* Since *Ali*, this Court and other federal courts faced with concurrent claims for excessive force/battery and for negligence have reached the same conclusion. *See, e.g.*, *Walker v. City of Lebanon, Ky.*, --- F. Supp. 2d ---, 2013 WL 6185402, at *9-10 (W.D. Ky. Nov. 25, 2013); *Marksbury v. Elder*, 2011 WL 5598419, at *8 & n.7 (E.D. Ky. Nov. 17, 2011).

For these reasons, the Court finds that Plaintiff's claims of negligence and negligence *per se* fail as a matter of law and must be dismissed.

## CONCLUSION

Therefore, having considered the parties' respective arguments, and being otherwise sufficiently advised;

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment, (Docket No. 17), is GRANTED IN PART and DENIED IN PART as follows:

(1) Defendant's Motion is DENIED relative to Plaintiff's excessive force and battery claims (Counts I & II);

(2) Defendant's Motion is GRANTED as to Plaintiff's negligence and negligence *per se* claims (Counts III & IV).

IT IS SO ORDERED.


Date:


cc: Counsel